SARAH CROSLAND

*v.*

REUBEN P. HALL and wife, et al.

A willful misrepresentation as to the income derived from the royalty on a certain patent, which induced a landowner to exchange his property for a one-half interest in such royalty, is sufficient evidence of fraud and deceit to set aside the conveyance.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. J. S. Mitchell,* for complainant.

*Mr. D. J. Pancoast,* for defendant.

THE CHANCELLOR.

On the 24th of December, 1877, the complainant, Sarah Crosland, held the legal title to a tract of land of about eighteen acres, in Landis township, in the county of Cumberland, and, according to the bill of complaint, was the owner thereof. The property was improved. There was on it a dwelling-house, besides other buildings and improvements. It appears to have been worth about $5,500. She also owned certain personal property on the premises, consisting of household furniture in the house,

NOTE.—Analogous cases may be found, where actions at law have been maintained for deceit as to the rent received from premises (*Elkins* v. *Tresham,* 1 *Lev.* 102 ; *Lysney* v. *Selby,* 2 *Ld. Raym.* 1118, 1 *Salk.* 211 ; *Wilson* v. *Fuller,* 3 *Q. B.* 68 ; *Brown* v. *Castles,* 11 *Cush.* 350 ; *Blacks* v. *Catlett,* 3 *Litt.* 140) ; or suits sustained or relief granted therefor in equity (*Brereton* v. *Cowper,* 2 *Bro. P. C.* 535 ; *Tottenham's Estate,* 15 *Ir. Ch.* 308 ; *Dimmock* v. *Hallet,* L. R. (2 *Ch.*) 21 ; *Flint* v. *Woodin,* 9 *Hare* 618 ; *Abbott* v. *Sworder,* 4 *De G. & Sm.* 448 ; *McShane* v. *Hazelhurst,* 50 *Md.* 107 ; *Wise* v. *Fuller,* 2 *Stew. Eq.* 257 ; *Boynton* v. *Hazelboom,* 14 *Allen* 107) ; or the profits derived from a theatre (*Harris* v. *Kemble,* 5 *Bligh* 730 ; *Bryan* v. *Hitchcock,* 43 *Mo.* 527) ; or the amount of business done at an inn (*Dobell* v. *Stevens,* 3 *B. & C.* 623 ; *Pearson* v. *Wheeler, Ry. & Moo.* 303 ; *Pilmore* v. *Hood,* 5 *Bing. N. C.* 97 ; *Bowring* v. *Stevens,* 2 *C. & P.* 337 ; *Richardson* v. *Dunn,* 8 *C. B.* (*N. S.*) 655 ; *Hutchinson* v. *Morley,* 7 *Scott*

farming and gardening implements, farm products &c., of the value of from $500 to $600. Prior to the day above mentioned, December 24th, 1877, she concluded to go, with her children, to Australia, to which place she was to be followed by her husband. On that day she executed and acknowledged, with her husband, a deed of conveyance in fee of the real property, but neither any consideration nor any grantee was mentioned in the instrument. Blanks for both were left in it, to be filled up when the husband should have found a purchaser for the property. Their object was to provide the husband in this way with the means of conveying the property in the wife's absence. She gave him no authority in writing to fill the blanks or deliver the deed. She afterwards departed for Australia, in February, 1878, taking with her her children, leaving her husband here, and leaving the deed in his possession for the purpose before mentioned. In December, 1878, Crosland agreed with Reuben P. Hall to convey the real and personal property to him in consideration of the assignment to the former of one-half of certain letters-patent, and the royalty thereunder, for what was called a " medico-electric " plaster. The agreement was carried out. The name of Hall's wife was, at his request, inserted in the deed as grantee. The blank for the consideration was filled so that the deed expressed a consideration of $6,000. The personal property was, at Hall's request, also transferred to his wife. An assignment of the interest in the letters-patent was made to Crosland. When

*341; Mather* v. *Robinson, 47 Iowa 403; Irving* v. *Thomas, 18 Me. 418*); or the receipts from cutting timber on the lands in question (*Lowndes* v. *Lane, 2 Cox. 363; Spurr* v. *Benedict, 99 Mass. 463*); or hay (*Mooney* v. *Miller, 102 Mass. 217; Martin* v. *Jordan, 60 Me. 531; Coon* v. *Atwell, 46 N. H. 510*); or their general productiveness (*Wright* v. *Wright, 37 Mich. 55; Hutcheon* v. *Johnson, 33 Barb. 392; ·Taylor* v. *Fleet, 4 Barb. 95; Pitts* v. *Cottingham, 9 Port. 675*); or the productive capacity of a mill (*Sieveking* v. *Litzler, 31 Ind. 13; Faribault* v. *Sater, 13 Minn. 223; Donelson* v. *Young, Meigs 155*); or the income received from defendant's business and good-will (*Dwight* v. *Chase, 3 Ill. App. 67;* see *Noetling* v. *Wright, 72 Ill. 390; Wells* v. *Millet, 23 Wis. 64*); or the number of subscribers and advertisers of a newspaper (*Harvey* v. *Smith, 17 Ind. 272*); or the net earnings of a factory (*Powell* v. *Elliott, L. R.* (*10 Ch.*) *424; Smith* v. *Newton, 59 Ga. 113*); or the productiveness of a mine (*Starnes* v. *Erwin, 10 Ired. 226;*

Crosland *v.* Hall.

the bargain was made there was a mortgage of $400 on the Crosland property.   At the making of the agreement for exchange, Hall agreed to lend Crosland $500 to enable him to go to Australia.   To raise that money and $200 for himself, Hall and his wife executed a mortgage for $700 to Crosland on the property, which Crosland was to negotiate.   Leverett Newcomb, to accommodate Crosland and to enable the latter to get the $500 by means of the mortgage for $700, agreed with Hall and Crosland to advance the $200 to Hall on the security of the assignment of the bond and mortgage by Crosland to him.   He took the assignment accordingly, and advanced $20 on account of the $200 to Hall at the time, and agreed to pay the balance of the $200 in five or six days thereafter.   A few days afterwards, he paid to Hall $24.10.   Shortly thereafter, Crosland, having become suspicious that Hall had defrauded him in the exchange, borrowed $80 of Newcomb to pay his expenses to Chicago, where he went to make inquiry about the patent.   A new assignment of the bond and mortgage was thereupon made by Crosland to Newcomb, to secure the sum of $280, the amount which Newcomb had agreed to pay Hall and the $80 lent by him to Crosland. Afterwards, Crosland having become satisfied that Hall had defrauded him, forbade Newcomb to pay Hall any more money, but Newcomb, notwithstanding, did, on Hall's demand, pay him the balance of the $200.   Hall and his wife, soon after the exchange was made, went into possession of the Crosland property,

*Gifford* v. *Carvill, 29 Cal. 589; Tuck* v. *Downing, 76 Ill. 71; Small* v. *Atwood, You. 461; Jennings* v. *Broughton, 17 Beav. 234*); or the quantity of saltpetre which so much nitrous earth would yield (*Perkins* v. *Rice, 6 Litt. 218; Peyton* v. *Butler, 3 Hayw. 141*); or the quantity of wool that sheep would shear per head (*Bryant* v. *Crosby, 40 Me. 9*); or the extent of sales of an engraving (*Shaeffer* v. *Sleade, 7 Blackf. 178*); or of a patent (*Allin* v. *Millison, 72 Ill. 201; David* v. *Park, 103 Mass. 501; Somers* v. *Richards, 46 Vt. 170; Gatling* v. *Newell, 9 Ind. 572; Swazey* v. *Herr, 11 Pa. St. 278*).

But representations as to *probable* sales, or value, or productiveness, are not actionable (*Miller* v. *Young, 33 Ill. 354; Bishop* v. *Small, 63 Me. 12; Hughes* v. *Antietam Co., 34 Md. 317; Crossman* v. *Penrose Co., 26 Pa. St. 69; Pedrick* v. *Porter, 5 Allen 324; Pike* v. *Fay, 101 Mass. 134; Hawkins* v. *Campbell, 6 Ark. 513; Cooley on Torts 484; 3 Am. Law Rev. 430*).—Rep.

and have held it ever since. The complainant knew nothing of the transaction with Hall (she went to Australia and has never returned), until after it had been completed. She never affirmed, but, on the contrary, repudiated it. She knew nothing of the transaction with Newcomb. She brings this suit by her next friend to obtain a decree declaring the deed and the transfer of the personal property, and the mortgage to Newcomb, void, and requiring Hall's wife to reconvey the property, real and personal, to her, and Newcomb to give up the mortgage to be canceled. Her claim to relief is based on the ground that the deed for the real property is void, because, though it was signed and acknowledged by her, yet there was then no grantee named therein, and she never gave lawful authority to her husband or any one else to insert therein the name of any person as grantee; and next that the deed was obtained under fraudulent misrepresentations made by Hall to her husband. As to the mortgage, she insists that if the deed to Hall's wife is void, the mortgage is void also. I do not consider it necessary to pass upon the question whether the deed is void in law or not. I am satisfied that the conveyance of the land and the transfer of the personal property ought to be set aside on the ground of fraud. In the exchange, Hall made a false representation of at least one very material fact to Crosland. The complainant, in her bill, alleges that Hall represented to Crosland that he had received for half of the royalty under the patent, $800 a year, in quarter-yearly payments. The answer not only denies that he made that statement, but alleges in substance that what he said was that he had received $200 a year, in quarter-yearly payments. But Crosland swears that Hall told him, when they were bargaining for the exchange, that the half of the royalty under the letters-patent had paid him and was then paying him $800 a year, and was "getting better all the time, and was only in its infancy." Major Walker, a counselor at law in Vineland, at whose office and by whom the blanks in the deed were filled, and the assignment of the interest in the patent-right and royalty drawn, and by whom the execution of it was witnessed, testifies that while they were in his office, at the time of the exchange of the papers,

Hall said that he had received from the royalty from $300 to $500 a quarter, and that that income would enable Crosland to live at his ease. Crosland swears to the same conversation. The defendants, Hall and wife, by their answer, not only deny that he told Crosland that Hall had received, for half of the royalty, $800 a year, but they give the impression that they mean to say that he never made any representation on the subject to Crosland at all, but that all the representation that was made was made, not to Crosland, but to the complainant herself. They swear, in the answer, that the complainant herself, in or about October, 1877, offered to sell the property to Hall in consideration of the half interest in the letters-patent and royalty, and that he told her that the amount received was $200 a year; but it is clear that this statement is entitled to no credit whatever. It is true, they produce a witness, Ransford P. Crowell (neither Hall nor his wife was sworn in the cause), who testifies that, in November, 1877 (he says it was just before the shop was destroyed by fire), in his meat-shop, in Vineland, he heard a conversation between the complainant and Hall, who was employed there, in which she said to Hall that "she was going away, and would leave with her husband a deed in blank, with her name signed to it, for her husband to dispose of as he thought best, and that she was willing that her husband should make the trade if he thought best." But the shop was burned in September, 1877, and Hall and his wife say, in the answer, that it was in October, 1877, when the complainant spoke to Hall on the subject, so that if the conversation took place in the shop, it must have been in or before September, which is prior to the time mentioned by Hall and his wife as the time when, as they say, the complainant first spoke to him on the subject. But further: the complainant swears that she never had any conversation with Hall on the subject, and Crosland swears that it was in December, 1877, when the matter was first spoken of, and then it was by Hall to him. The statement as to the amount which Hall had received for the half of the royalty was an important and material representation, calculated to deceive Crosland as to the value of that which Hall was then proposing to give him in ex-

change for the property. The royalty was derived from the sale of the patented article, and the amount which Hall had received and was then receiving was a criterion of its value. That it was so intended appears from Crosland's testimony, which is as follows : Hall, knowing that the Crosland property was for sale, in December, 1878, called on Crosland, on the premises, and looked at it, and inquired of Crosland the price. He was told it was $5,000 cash. He said he did not know whether his family would like to live in the country or not. Crosland exhibited to him a photographic view of the buildings, and Hall said he would take it home and show it to his family. A few days afterwards, Crosland saw him at the post-office, and asked him how his family liked the place. He answered that they liked it very well, and he said he would go with him and look at it again. They went together to the property accordingly, and, after Hall had examined it again, he and Crosland went into the house, and then he proposed the exchange of the half of the patent-right and royalty for the property. Crosland swears that Hall then said that he had a proposition to make, and on Crosland's asking what it was, he replied that he owned a royalty in a plaster, a galvano-electric plaster, which was then, as he said, being manufactured by a firm in Chicago. Crosland, in his testimony, proceeds as follows :

"Said he, 'Now I will give you one-half interest in it [the royalty] for this property; it will realize you $800 a year—$200 a quarter—and you will receive it in three days after it is due ; see what a nice thing that will be for you and your family—and it will get better all the time ; the thing is only in its infancy; the company has got $20,000 invested in it, and I would not take $20,000 to-day for the other half of the royalty; I assure you, Crosland, I would not make you such an offer as that if I had not got plenty to live on without it; I've got $3,000 a year coming in from other sources, and I am doing a deed of charity to give you half of the royalty ; I don't care about a farm for myself; if I make a trade with you it shall be for my boys to farm and keep them out of mischief; I would build a brick residence up in the peach orchard for myself and wife, and let the boys run the farm;' he said the half of that royalty was worth a hundred farms; I said, 'Mr. Hall, are you telling me the truth ?' 'Crosland,' said he, 'do you suppose I would tell you a lot of lies, and rob you and your children out of your little home? don't you know I am a member of the church, and in good standing ?' He then held up his hands as if he were praying, and said, 'As

Crosland *v.* Hall.

God is my judge, Crosland, I wish He may strike me dead if every word I have told you is not true; I am your friend; I am none of your Vineland sharks; what I offer you will be a living for you and your children; now, if we make such a trade, I don't want you to say a word about it to any one, and so long as you are going to Australia with Mr. Stiles, it is nobody's business; there are men in this town [Vineland] who envy me because I can live without work; they would like to know my business, but I will not tell it to them; now if you will come down town with me, we will go to E. M. Turner's [Mr. Turner was a lawyer in Vineland] office, and get the thing fixed up;' I said 'Now, Mr. Hall, if I make a trade with you, and all is true what you have told me, how am I to get to Australia?' Hall said, 'I value my royalty at $6,000, and you value your place at $5,500; I'll lend you $500 to pay your way to Australia; you have a mortgage on your place for $400; the $500 I lend you and the $400 on the place will make $900; now, Crosland, I won't be hard on you; I will give you a good chance; I will let you receive the royalty for two years—then the $500 I loan you and the $400 will be stopped out of the royalty, and then the royalty is yours again.' "

Crosland adds :

" Well, of course I agreed to trade him; he was to give me the $500 when we got to the house, or bring it with him; it was to be cash when the deed was made."

Crosland further says that in Major Walker's office, when the papers were exchanged, he asked Walker what he thought of the trade he had made, and Walker said that it " was too much like a lottery, those patent plasters," and Hall replied, " Major Walker, I am giving Crosland what will be a living for himself and family, and it will realize him from $300 to $500 a quarter;" and Crosland is, as before stated, corroborated on this point by Major Walker. Those statements made by Hall as to the amount which he had derived and was deriving from the half of the royalty which he was selling to Crosland, were untrue to his knowledge. He had knowledge on the subject, and Crosland had none, and his asseverations of the truth of his statements were calculated and designed to induce Crosland to rely on them. The misrepresentation was a gross fraud, and is sufficient ground for setting aside the conveyance and transfer of Mrs. Crosland's property. Hall and his wife have not attempted to show that the half of the royalty had any value whatever, but, on the hearing, relied on the want of proof on the subject of value or pro-

ductiveness. But the fact that he made the statement in Major
Walker's office, that the half had produced and was producing
him from $300 to $500 a quarter, or from $1,200 to $2,000 a
year, is established, and supports the testimony of Crosland that
Hall told him that he had realized and was realizing from it
$800 a year. The bill alleges that the half had never produced
as much as even $200 a year, and the answer does not deny it.
Nor does it deny the allegations of the bill as to the small and
inconsiderable value of the letters-patent and royalty. The evi-
dence shows gross and deliberate deceit, with design to circum-
vent, on the part of Hall. It may be added that the bill alleges
that he had anticipated the royalty up to April 1st, 1879, al-
though he transferred the half of it, from January 1st, 1879, to
that date, to Crosland, and the answer does not deny it. There
will be a decree requiring Hall and wife to reconvey the property,
both real and personal, to the complainant, and Crosland will be
required, at the same time, to deliver to Hall an assignment, duly
executed, for the interest in the patent-right and royalty &c. as-
signed by Hall to him, and to pay any royalty he may have re-
ceived thereunder. Hall and wife will be required to account
and pay for the use and occupation of the property, real and
personal, and he will be required to account for and pay the $200
received by him from Mr. Newcomb, with interest thereon. As
to the amount due Mr. Newcomb on his mortgage, the complain-
ant must do equity. She must pay the money, $280, with
interest, advanced by him on the security of the assignment of
the mortgage. Of that money, $80 were advanced to enable
Crosland to make inquiries, with a view to recovering back her
property if a fraud had been committed by Hall. That, as well as
the rest of the $280, was paid on a mortgage which was given
by Hall and his wife on the property, to which the latter had
title by a deed executed by the complainant and her husband,
and, so far as Mr. Newcomb knew, it was duly made and exe-
cuted and acknowledged. The mortgage was given by Hall and
his wife to raise money for them—$200 for their own use and
the rest to be lent by them to Crosland. Newcomb paid $44.10
of the $200 before any notice not to pay was given him, and as

to the rest he took the advice of counsel before paying it. He should be protected, under the circumstances, from loss in the setting aside of the conveyance, and he should have his costs payable, in the first instance, by the complainant, but recoverable by her from Hall. Hall will be required to pay costs of both the complainant and Newcomb.